**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

JOANNE GRAFTON, ET AL.          CIVIL ACTION NO. 13-2940

VERSUS                         JUDGE S. MAURICE HICKS, JR.

KEN BAILEY, ET AL.              MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

Before the Court is Defendants Claiborne Sheriff Ken Bailey ("Sheriff Bailey") and Deputy Lashenda Tate's ("Deputy Tate") (collectively the "Defendants") "Motion for Summary Judgment" (Record Document 35) pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking to dismiss Plaintiffs Joanne and Billy Grafton's ("Plaintiffs") Eighth Amendment and Louisiana state law claims. For the reasons discussed herein, Defendants' motion is hereby **GRANTED**.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are the parents of Shelly Grafton ("Grafton"), a convicted felon, who was first jailed in Ruston, La., at the Lincoln Parish Detention Center. <u>See</u> Record Document 35-4. While there, Dr. Pamela Hearn ("Dr. Hearn") examined Grafton and prescribed several medications for her. <u>See</u> Record Document 35-10. Dr. Hearn is a physician who works for the La. Dept. of Corrections and LaSalle Management Co. at several detention centers in various parishes. Dr. Hearn provides medical treatment for inmates in Claiborne Parish at David Wade Correctional Center, Claiborne Parish Detention Center, and the Claiborne Parish Women's Jail (the "Jail"). <u>See</u> Record Document 35-11.

On February 21, 2012, Grafton was transferred from Lincoln Parish to the Jail. <u>See</u> Record Document 35-12. She was given an initial Medical Screening during booking. <u>See</u>

id. The next day, Grafton was taken to see Dr. Hearn and her nurse at the Claiborne Parish Detention Center for a thorough Medical Intake Screening by a physician. See Record Document 35-13. Dr. Hearn continued the medications which she had recently prescribed for Grafton while in Lincoln Parish. See id.

On July 1, 2012, Grafton showed a jailer a boil that she had under her arm. See Record Document 35-14. On July 3, Grafton was taken to see Dr. Hearn at the Detention Center. See Record Document 35-15 at 2. Dr. Hearn prescribed antibiotics and an ointment. See Record Document 35-16 at 4. The boil under Grafton's arm healed without any complications. See id. at 10. On November 12, 2012, Grafton submitted a Request for Medical Treatment. See Record Document 35-17. She complained of diarrhea, chronic back and knee pain, and wanted to see Dr. Hearn about her prescription medications. See id. On November 19, Grafton was taken to see Dr. Hearn. See Record Document 35-18 at 2. Dr. Hearn noted Grafton's medical history and problems, and (re)prescribed several medications. See Record Document 35-19 at 4.

On December 11, 2012, Grafton submitted a Request for Medical Treatment. She complained about a boil on her stomach. See Record Document 35-20. Although Plaintiffs state Grafton was not treated for this infection, Nurse Edwards was notified of her condition on December 14, 2012, and did not think her condition warranted a trip to the hospital. See Record Document 35-21 at 7. Instead, Nurse Edwards prescribed Grafton an antibiotic and warm compresses per Dr. Hearn's orders. See id. at 2. In the following week, Grafton's health deteriorated. On Saturday evening, December 15, 2012, Grafton was reportedly found unconscious on the floor of her jail cell. See Record Document 35-22. Emergency medical personnel were called, and Grafton was transported to the Homer

Hospital Emergency Room by ambulance. See Record Document 35-23 at 9. At the hospital, medical personnel examined Grafton, ran tests, and diagnosed her with an abscess or boil (possibly due to staph) on her stomach. See Record Document 35-24 at 2. Grafton was treated with intravenous antibiotics, prescribed oral antibiotics, and instructed on how to care for the boil. See id. Later that night, the Hospital discharged Grafton and sent her back to the Jail, with instructions for her follow-up care. See id. at 5. Grafton's cellmate, Christina Bowen ("Bowen"), claims the hospital told Grafton she was septic, although there is no evidence in the record to support such a claim. See Record Document 38-3 at 21-22. The discharge instructions and Hospital records were provided or available to Nurse Edwards and Dr. Hearn, who provided Grafton's follow-up treatment. See Record Document 35-24; Record Document 35-35 at 4; Record Document 35-30 at 10.

On Monday through Friday, December 17-21, 2012, Nurse Edwards came to the jail on a daily basis to treat Grafton's boil according to the Hospital's discharge instructions. See Record Document 35-26 at 2-5; Record Document 35-27. Although Grafton's prescription medications were made available to her, it appears she stopped taking them. After Grafton's death, Bowen found a number of pills in Grafton's things. The pills found were the following:

- Nine (9) Citalopram. This is an antidepressant. Grafton had a prescription for three (3) per day.

- Two (2) Meloxicam. This is an anti-inflammatory/muscle relaxant for arthritic pain. Grafton's prescription was for one (1) per day.

- Two (2) Mapap, or Tylenol. Grafton's prescription: two (2) per day.

- Two (2) Amlodipine/Benazepri. This is for blood pressure. Her prescription: two (2) per day.

- One (1) Omeprazole. This is for acid reflux. Her prescription: two (2) per day.

- Two (2) Clindamycin. This is an antibiotic. Her prescription: three (3) per day.

-  One (1) package of Cholestyramine for diarrhea. Her prescription: one (1) per day.

Record Document 35-33 at 5.

On Friday morning, December 21, Nurse Edwards came to the jail at 9:47 a.m. to treat Grafton. See Record Document 35-28 at 2. The boil had improved and appeared to be healing. See Record Document 35-26 at 14. Nurse Edwards left the jail at 10:40 a.m. See Record Document 35-28 at 2. At 11:10 a.m., Grafton refused to get out of bed to eat lunch or to get her prescription medications. See id. Deputy Tate called Nurse Edwards and told her about Grafton. See id. at 7. That afternoon at 1:40 p.m., Deputy Tate entered Grafton's cell block and found Grafton lying on the floor beside the bed in her cell. See id. at 5. Grafton was conscious and responsive, but said she was not feeling well. See Record Document 38-6 at 8. Bowen, who was lying on the top bunk, did not know that Grafton was on the floor or how she got there. See id. at 8. Deputy Tate called Nurse Edwards and told her about Grafton and her various complaints. See Record Document 35-29 at 2. Nurse Edwards did not see a need to call an ambulance and instructed Deputy Tate to watch Grafton until she could return. See id. Grafton was moved to a holding cell and placed in a bed where she could be constantly monitored by video. See Record Document 38-6 at 8-9.

In addition to monitoring Grafton on the video, Deputy Tate went to the holding cell several times, checked on Grafton, talked to her, and made sure she was comfortable.

See id. at 9. When Deputy Tate went to the holding cell at 2:06 p.m., Grafton was conscious, responsive, and coherent. See Record Document 35-29 at 2. Deputy Tate told Grafton that Nurse Edwards should be there shortly. See id. At about 2:23 p.m., Deputy Tate called Nurse Edwards again. Deputy Tate told Nurse Edwards that she was concerned about Grafton who was complaining about her breathing. See id. Nurse Edwards did not see any need to send Grafton to the emergency room. See id. Nurse Edwards told Deputy Tate that in order to put her mind at ease, she would call Dr. Hearn and then call her (Deputy Tate) back. See id.

At 2:30 to 2:35 p.m., Nurse Edwards called Dr. Hearn. Dr. Hearn told Nurse Edwards to wait until she finished her business at the Detention Center, then go see Grafton, and to call her back if there were any changes. See Record Document 35-30 at 2. Nurse Edwards called Deputy Tate back and told her what Dr. Hearn had ordered, notably that Grafton had already been to the hospital before, that she was taking her antibiotic, and "we just didn't take them to the doctor just because they requested it." Record Document 38-6 at 13. Nurse Edwards had just seen Grafton that morning at the Jail, and Grafton was fine. See Record Document 35-26 at 5. Nurse Edwards was involved in a medical situation at the Detention Center and planned to come to see Grafton again as soon as she finished there. See Record Document 35-29 at 11-12.

At approximately 2:46 p.m., Grafton did not respond when Deputy Tate entered the holding cell and called her name. See Record Document 35-29 at 2. Deputy Tate checked Grafton's pulse and breathing and tried an ammonia pack under her nose. See id. at 21. Deputy Tate called Nurse Edwards again and called for an ambulance at approximately 2:50 p.m. See Record Document 35-33 at 7. Deputy Tate, who was

certified in cardiopulmonary resuscitation ("CPR"), did not perform CPR on Grafton. See Record Document 38-6 at 17-20. Deputy Tate has stated that she looked for something to cover Grafton's mouth in order to perform CPR, but could not find anything. See id. At approximately 2:52 p.m., six minutes after Deputy Tate originally discovered Grafton unresponsive, the ambulance arrived. See Record Document 35-33 at 7. During these six minutes, Deputy Tate was "trying to call people … checking for the ambulance, running in and out of the room trying to see is the ambulance here yet." Record Document 38-6 at 22. Nurse Edwards arrived a few minutes later at 2:56 p.m. See Record Document 35-33 at 7. The ambulance transported Grafton to Homer Memorial at 3:12 p.m. where she was pronounced dead at 3:52 p.m. See id.

Subsequently, an autopsy was performed by Dr. Frank Peretti ("Dr. Peretti"), who found the cause of death to be "Sepsis due to Abdominal Wall Abscess and Cellulitis" and listed "Fracture of Thoracic Spine" as a contributing factor. See Record Document 35-31 at 3. There was no evidence of criminal wrongdoing or physical abuse to Grafton. See Record Document 35-32 at 15. Capt. Kenny Sanders, an expert retained by Defendants, found the officers' conduct was reasonable under the circumstances and found no evidence of deliberate indifference. See Record Document 35-34 at 6. A Medical Review Panel, consisting of three doctors, found that Homer Memorial Hospital, its staff, and Dr. Pamela Hearn failed to comply with the appropriate medical standards of care in their treatment of Shelly Grafton. See Record Document 35-35 at 2-3. The substandard care of Homer Hospital, its staff, and Dr. Hearn were factors in Grafton's death. See id. Dr. John Giroir ("Dr. Giroir"), an Emergency Medicine physician and member of the Medical Review Panel, provided an expert report for the Plaintiffs, stating "Grafton …

might have survived her infection if more aggressive treatment would have offered [sic] in a timely fashion." Record Document 35-36 at 3.

On October 25, 2013, Plaintiffs filed the instant civil rights lawsuit for violation of Grafton's Eighth Amendment rights as well as Louisiana state law claims for her wrongful death and survival action, and for her pain and suffering. <u>See</u> Record Document 1. Defendants moved for summary judgment on all of Plaintiffs' claims, under both federal and state law, on February 2, 2017. <u>See</u> Record Document 35. Defendants argue there is no evidence of deliberate indifference and they are entitled to qualified immunity. <u>See</u> <u>id</u>. Plaintiffs opposed the motion for summary judgment on February 21, 2017, arguing there is sufficient evidence to show Defendants acted with deliberate indifference. <u>See</u> Record Document 38. Defendants filed their reply on February 28, 2017. <u>See</u> Record Document 39. Thus, this matter is fully briefed and ripe for decision.

## LAW AND ANALYSIS

### I.    LEGAL STANDARDS

#### A.  Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. This rule provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Also, "a party asserting that a fact cannot be or is genuinely disputed must support the motion by citing to particular parts of materials in the record." Fed R. Civ. P. 56(c)(1)(A). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... grant summary judgment." Fed. R. Civ. P. 56(e)(3).

In a summary judgment motion, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings ... [and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (internal quotations and citations omitted). If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts that prove that a genuine issue of material fact exists. See id. at 325, 106 S.Ct. at 2554; see Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). A non-movant, however, cannot meet the burden of proving that a genuine issue of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Little, 37 F.3d at 1075. Additionally, in deciding a summary judgment motion, courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is when both parties have submitted evidence of contradictory facts." Id. Courts "do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Id.

Rule 56 states that "a party asserting that a fact ... is genuinely disputed must support the assertion by citing to particular materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, ... admissions, interrogatory answers, or other materials." Once the party seeking to establish that there is a genuine dispute as to a material fact has cited to such materials, the opposing party "may object that the material cited to support or dispute a fact cannot

be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56. "At the summary judgment stage, materials cited to support or dispute a fact need only be capable of being presented in a form that would be admissible in evidence." <u>LSR Consulting, LLC v. Wells Fargo Bank, N.A.</u>, 835 F.3d 530, 534 (5th Cir. 2016). However, once a party has challenged the admissibility of the evidence relied upon to demonstrate a genuine dispute of material fact, the proponent of that evidence must show that the evidence is capable of being presented in a form that would be admissible in evidence. <u>See id.</u> at 534.

### B. Section 1983 Suits: Individual Capacity vs. Official Capacity Claims

Section 1983 authorizes the assertion of a claim for relief against a person who, acting under the color of state law, allegedly violated the claimant's rights under federal law. <u>See</u> 42 U.S.C. § 1983. In Section 1983 suits, government officials may be sued in either their individual or official capacities. A claim against a state or municipal official in his official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Individual or personal capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law." <u>Id.</u>

### C. Qualified Immunity

The doctrine of qualified immunity insulates government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526,

105 S.Ct. 2806, 2815 (1985). Therefore, the defense of qualified immunity is "effectively lost if a case is erroneously permitted to go to trial." Id. Accordingly, qualified immunity questions should be resolved by courts at the earliest possible stage in litigation. See Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 536 (1991).

Claims of qualified immunity require a two-step analysis. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2155 (2001). First, the court must determine whether "the facts alleged show the officer's conduct violated a constitutional right." Id. Second, if a violation has been established, the court must then determine whether the officer's actions were objectively reasonable in light of clearly established law at the time of the conduct in question. See id. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202, 121 S.Ct. at 2156; see also Goodson v. Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000) ("the touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him"). Accordingly, if officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact. See Tarver v. City of Edna, 410 F.3d 745, 750 (5th Cir. 2005).

Courts need not evaluate the two questions in any particular order. See Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 818 (2009) (lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand"). Furthermore, although normally an affirmative defense, the

plaintiff has the burden to negate the defense of qualified immunity once properly raised. See Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008).

## II.   ANALYSIS

### A. Defendants' Objection to the Affidavit of Kathryn Wild

In their opposition, Plaintiffs submitted the affidavit of Nurse Kathryn Wild ("Nurse Wild") who opined that "the emergency response [of Deputy Tate] was well below the standard of care" and "the correctional officers at the Claiborne Parish Women's Jail were subjectively aware that [ ] Grafton was in need of medical treatment for a serious condition and consciously disregarded her serious health care needs." Record Document 38-2 at 9-10. Defendants argue Wild is not qualified to render opinions about the conduct of law enforcement officers, and thus, her opinion should be stricken. See Record Document 39 at 1.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. See Fed.R.Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588, 113 S.Ct. 2786 (1993); United States v. Hitt, 473 F.3d 146, 148 (5th Cir. 2006). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"To qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'" United States v. Hicks, 389 F.3d 514, 524 (5th Cir. 2004), quoting United States v. Bourgeois, 950 F.2d 980, 987 (5th Cir. 1992). Additionally, Rule 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education." Hicks, 389 F.3d at 524; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147, 119 S.Ct. 1167 (1999) (discussing witnesses whose expertise is based purely on experience). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." Huss v. Gayden, 571 F.3d 442, 452 (5th Cir. 2009), quoting Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999).

The Court finds Nurse Wild is not qualified to testify to the conduct and actions of law enforcement officers. Thus, her opinions are inadmissible. The fact that Nurse Wild has 31 years of experience in the correctional health setting does not qualify her to testify as to whether the law enforcement officers were "deliberately indifferent." Nurse Wild begins her "Discussion and Opinion" section by concluding that based on "my 31 years in the correctional health setting, it is my opinion that the care provided by … health providers … was so dysfunctional, uncaring and haphazard, that it amounted to deliberate indifference." Record Document 38-2 at 6. Nurse Wild then reviews national accreditation standards and Louisiana statutes as they relate to health care providers. See Record Document 38-2 at 6-9. After comparing these standards with the actions of Dr. Hearn and Nurse Edwards, Nurse Wild then concludes that "the emergency response [of Deputy Tate] was well below the standard of care" and "the correctional officers at the Claiborne

Parish Women's Jail were subjectively aware that [ ] Grafton was in need of medical treatment for a serious condition and consciously disregarded her serious health care needs." Record Document 38-2 at 9-10.

Although Nurse Wild has a specialized knowledge in the field of correctional health care, she fails to show how she has any specialized knowledge of the standards or guidelines of correctional officers -- Nurse Wild has no experience or training as a law enforcement officer or as an officer at a correctional facility. Thus, she is unqualified on this issue and her testimony on this matter is excluded. See Lee Green v. LA. Dep't of Pub. Safety & Corr., 2010 WL 1628769, *4 (W.D. La. 2010). The Court acknowledges that Nurse Wild may be qualified to render her opinions on the actions of Nurse Edwards, but her actions are not at issue in this matter. Nurse Wild is not a medical doctor and cannot opine on the conduct or standard of care pertaining to Dr. Hearn. Therefore, the Court finds Nurse Wild's opinions inadmissible under Fed. R. Evid. 702(a).

### B. Plaintiffs' Official Capacity Claims against Deputy Tate

Plaintiffs' complaint does not state whether they are seeking relief under Section 1983 against Deputy Tate in her official or individual capacity. See Record Document 1. Thus, the Court must assume that they seek relief against her in both capacities.

Plaintiffs cannot obtain relief against Deputy Tate in her official capacity because a suit against a public official in her official capacity is simply a suit against the local government entity itself. Therefore, the proper official to sue in his/her official capacity to impose liability upon a local governmental entity is the official with final policymaking authority for the entity under state or local law. See Burge v. Parish of St. Tammany, 187 F.3d 452, 468-70 (5th Cir. 1999), citing, inter alia, St. Louis v. Praprotnik, 485 U.S. 112,

123 (1988) (plurality opinion). It is undisputed that Deputy Tate is a jailer with the Claiborne Parish Sheriff's Office, under the supervision of Sophia Burns, Warden of the Jail. See Record Document 38-5 at 7. Therefore, Deputy Tate is unquestionably not the final policymaking authority for the Jail, and as such is not the appropriate official to sue in her official capacity to impose liability on the Claiborne Parish Sheriff's Office.

### C. Plaintiffs' Inadequate Medical Care Claims against Deputy Tate

Plaintiffs claim that Grafton did not receive proper medical care while incarcerated in Claiborne Parish. Defendants argue there is no evidence of deliberate indifference and Deputy Tate is entitled to qualified immunity. See Record Document 35. Again, claims of qualified immunity require a two-step analysis. See Saucier, 533 U.S. at 201, 121 S.Ct. at 2155. First, the court must determine whether "the facts alleged show the officer's conduct violated a constitutional right." Id. Second, if a violation has been established, the court must then determine whether the officer's actions were objectively reasonable in light of clearly established law at the time of the conduct in question. See id. Courts need not evaluate the two questions in any particular order. See Pearson, 555 U.S. at 236, 129 S.Ct. at 818. The Court will first analyze whether Deputy Tate's conduct violated Grafton's Eighth Amendment rights.

Medical care claims asserted by, or on behalf of, convicted prisoners are analyzed under the Eighth Amendment's prohibition of cruel and unusual punishment. In order to prevail on such claims, convicts must establish that the refusal or delay in providing medical care was "sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285 (1976). Deliberate indifference in the context of the failure to provide reasonable medical care to a convicted

prisoner means that: (1) the prison officials were aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the officials actually drew that inference; and (3) the officials' response indicated that they subjectively intended that harm occur. See Thompson v. Upshur County, Texas, 245 F.3d 447, 458-59 (5th Cir. 2001). Deliberate indifference is an exacting standard – "an extremely high standard to meet." Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006). "[T]he failure to alleviate a significant risk that [the official] should have perceived, but did not is insufficient to show deliberate indifference." Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001).

Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." Thompson, 245 F.3d at 459. "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir.1997). "A showing of deliberate indifference requires the prisoner to submit evidence that prison officials 'refused to treat [her], ignored [her] complaints, intentionally treated [her] incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" Gobert, 463 F.3d at 346, quoting Domino, 239 F.3d at 756.

In addition, Section 1983 requires a showing of proximate causation, which is evaluated under the common law standard. See Easter v. Powell, 467 F.3d 459, 463 (5th Cir. 2006) ("The mere delay of medical care can also constitute an Eighth Amendment violation but only "if there has been deliberate indifference [that] results in substantial harm."); see also Kelly v. Goodwin, 2014 WL 28803, *3 (W.D. La. 2014) ("In any event,

in order to allege a violation of the Eighth Amendment plaintiff must not only demonstrate deliberate indifference on the part of the defendants, but he must also demonstrate that the deliberate indifference resulted in substantial harm.").

### i. Plaintiffs' Medical Care Claims up until December 21, 2012

Plaintiffs allege Grafton received inadequate medical care the week following her December 15, 2012 hospitalization due to a boil on her stomach possibly as a result of staph. However, an inmate's medical records may rebut allegations of deliberate indifference. See Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995). Here, there is no dispute that Grafton received adequate medical care.

The crux of Plaintiffs' claim during this time period is that as a result of Grafton's hospitalization on December 15, 2012, she was diagnosed as septic, and that Deputy Tate's treatment of Grafton following such diagnosis constituted deliberate indifference. See Record Document 38 at 9. It is uncontested that sepsis is a serious condition;[1] however, there is no evidence that Deputy Tate (nor anyone for that matter) was subjectively aware of Grafton's diagnosis. Further, there is no evidence that Deputy Tate's actions toward Grafton indicated she "subjectively intended" the harm (Grafton's death) to occur.

Plaintiffs' claim that Grafton was diagnosed with sepsis comes from the deposition testimony of her cellmate, Bowen, who stated the hospital "gave her antibiotics and stuff, and they told her that she was septic." Record Document 38-3 at 21-22. Defendants objected to Bowen's testimony, stating her knowledge is "limited and biased" and that she

---

[1] "Sepsis is a systemic blood infection in which pathogens and poisonous products infect the blood stream." Lawson v. Dallas County, 112 F.Supp.2d 616, 622 n. 11 (N.D. Tex. 2000). According to Stedman's Medical Dictionary, 28th ed., sepsis is "[t]he presence of various pathogenic organisms, or their toxins, in the blood or tissue."

is not qualified to speculate about facts. <u>See</u> Record Document 39 at 2. However, viewing the evidence in light most favorable to Plaintiffs, they cannot show Deputy Tate was "subjectively aware" of Grafton's diagnosis. In fact, the evidence shows that no one knew (not Homer Hospital, not Dr. Hearn, not Nurse Edwards, not Dr. Peretti, not Dr. Giroir – particularly Deputy Tate) that Grafton had sepsis until after an autopsy was performed. <u>See</u> Record Documents 35-24, 35-31, and 35-36. Therefore, Plaintiffs cannot prove deliberate indifference on behalf of Deputy Tate for her treatment of Grafton during this period.

Assuming *arguendo* that Plaintiffs could prove Deputy Tate was subjectively aware of Grafton's serious medical condition, they could not show how Deputy Tate subjectively intended any harm to Grafton. There is no evidence that Deputy Tate "refused to treat [Grafton], ignored [her] complaints, intentionally treated [her] incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." <u>Gobert</u>, 463 F.3d at 346.

There is no dispute that Grafton received medical treatment. Plaintiffs, however, disagree with the level and/or course of that treatment. Plaintiffs' claim that Grafton should have received better medical treatment than what she actually got. According to Plaintiffs' expert, Grafton's medical treatment was not successful and should have been "more aggressive." Record Document 35-36. Grafton should have been treated "with aggressive intravenous antibiotics and aggressive wound drainage and debridement by a surgeon." <u>Id</u>. Thus, according to Plaintiffs, the hospital, doctors, and nurses – i.e., the medical care providers -- committed malpractice.

Deputy Tate is a law enforcement officer -- not a medical professional. She is not responsible for medical doctors and nurses who may have failed to correctly diagnose or properly treat Grafton. "Unsuccessful medical treatment, acts of … medical malpractice, [or] a prisoner's disagreement with his medical treatment … do not constitute deliberate indifference." <u>Gobert</u>, 463 F.3d at 346.

Grafton had a boil that was being treated daily by professional medical care providers. <u>See</u> Record Document 35-26 at 2-5; Record Document 35-27. It appeared to be healing. <u>See id</u>. at 14. However, according to Plaintiffs' expert, the boil "progressed to sepsis." Record Document 35-36 at 3. It was not unreasonable or deliberately indifferent for Deputy Tate to rely upon and defer to the medical care providers' treatment and orders regarding Grafton.

Deputy Tate did not delay or prevent Grafton's access to medical care. Plaintiffs contest this conclusion, citing Grafton's December 11, 2012 request for medical treatment which they argue "there was no assessment from anyone on the medical staff, until [ ] Grafton passed out 4 days later." Record Document 38-1 at 3. However, this argument ignores undisputed evidence in the summary judgment record.

December 11, 2012 was a Monday. Grafton worked in the kitchen that morning. That afternoon, Nurse Edwards came to the Jail to see inmates who had medical complaints. <u>See</u> Record Document 39-1. Grafton, however, did not reveal her condition or submit her Medical Request Form until after Deputy Winzer came on duty at 6:00 p.m. -- well after Nurse Edwards had left the facility. <u>See id</u>. at 3. In her Medical Request Form, Grafton did not check the box for an "Emergency." Instead, she asked to be seen at the next "Routine Sick Call," which all inmates knew would not happen until Friday, December

14. <u>See</u> Record Documents 35-20 and 40. That Friday, Deputy Walker reminded Nurse Edwards about Grafton's condition. <u>See</u> Record Document 35-21 at 2. Nurse Edwards made a medical decision, apparently in consultation with Dr. Hearn (who had treated Grafton's earlier boil). <u>See id</u>. at 4. The medical personnel did not think Grafton's condition warranted a trip to the hospital. <u>See id</u>. at 7. Pursuant to Dr. Hearn's orders, Grafton was prescribed an antibiotic and warm compresses. <u>See id</u>. at 2-5.

Plaintiffs do not show how these events pertain to Deputy Tate whatsoever. Nonetheless, the record shows the jailers were not deliberately indifferent, but rather reveals they helped Grafton in this instance.

The records also show that Grafton was given her medicine every day. <u>See</u> Record Document 35-6. Plaintiffs argue "medicine that is not taken is worthless to the patient." Record Document 38-1 at 2. After Grafton died, Bowen reportedly found a number of pills in Grafton's things.  The pills found were the following:

- Nine (9) Citalopram. This is an antidepressant. Grafton had a prescription for three (3) per day.

- Two (2) Meloxicam. This is an anti-inflammatory/muscle relaxant for arthritic pain. Grafton's prescription was for one (1) per day.

- Two (2) Mapap, or Tylenol. Grafton's prescription: two (2) per day.

- Two (2) Amlodipine/Benazepri. This is for blood pressure. Her prescription: two (2) per day.

- One (1) Omeprazole. This is for acid reflux. Her prescription: two (2) per day.

- Two (2) Clindamycin. This is an antibiotic. Her prescription: three (3) per day.

-  One (1) package of Cholestyramine for diarrhea. Her prescription: one (1) per day.

Record Document 35-33 at 5.

Other than the antidepressant and the anti-inflammatory, these pills constitute less than one day's worth of Grafton's prescriptions. This is clearly not evidence that Deputy Tate was somehow mistreating Grafton. The fact that Grafton may not have taken every dose of her numerous pills one day does not support Plaintiffs' argument. See Elliott v. Deen, 2007 WL 979928, *4 (W.D. La. 2007), aff'd sub nom. Elliott v. Dean, 249 F. App'x 333 (5th Cir. 2007) (finding no Eighth Amendment violation where the records showed plaintiff was given his medicine every day, except for the days he refused to take it).

Deputy Tate provided Grafton with continuous, unimpeded access to medical professionals and treatment during this time period. The record shows Deputy Tate (and other officers for that matter) facilitated Grafton's access and took numerous affirmative steps to obtain medical care for her. Deputy Tate was following doctors' orders. There is no evidence that defendants intended to harm Grafton. Accordingly, there is no evidence of deliberate indifference. As Plaintiffs cannot prove Deputy Tate's conduct violated Grafton's constitutional rights, Deputy Tate is entitled to qualified immunity as to Plaintiffs' medical care claims up until December 21, 2012.

### i. Plaintiffs' Medical Care Claims on December 21, 2012

First, Plaintiffs argue that Deputy Tate acted with deliberate indifference by failing to call an ambulance when Grafton complained to her of her difficulty breathing. See Record Document 38 at 10; Record Document 38-1 at 3. Regarding this claim, the evidence is clear that Deputy Tate did not impede Grafton's access to medical attention, but rather followed the medical orders she was given. Deputy Tate called Nurse Edwards and reported Grafton's breathing complaint. However, Nurse Edwards, who had seen and

treated Grafton earlier that morning, and after a discussion with Dr. Hearn, did not see any need to send her to the emergency room. Nurse Edwards' statement that "we just didn't take them to the doctor just because they requested it" is irrelevant and immaterial to Plaintiffs' claims against Deputy Tate. Record Document 38-6 at 13.

As stated above, Deputy Tate is not a medical care provider. When Deputy Tate learned of Grafton's worsening condition, she contacted a medical care professional. Deputy Tate was following doctor's orders. "When a prison official defers to a doctor's or a nurse practitioner's opinion as to how an inmate should be treated for a medical condition, the high standard of deliberate indifference is not established." Elliot, 2007 WL 979928 at *4. Accordingly, Plaintiffs have not shown that Deputy Tate deprived Grafton of medical care when she failed to call an ambulance on December 21, 2012.

The Plaintiffs' most concerning piece of evidence is the fact that Deputy Tate, who is certified in CPR, failed to perform CPR on Grafton when she found Grafton unresponsive in her cell. Plaintiffs assert Deputy Tate's "exacerbating" or "total failure" to administer life-saving procedures is sufficient to prove Deputy Tate's deliberate indifference to Grafton's serious medical needs. See Record Document 38 at 13. Defendants believe Plaintiffs' argument is "irrelevant" and "immaterial" since Plaintiffs have not produced any evidence that shows the failure to perform CPR caused Grafton any harm. See Record Document 39 at 7, 9, 10.

First, Plaintiffs' argument that Deputy Tate's actions constituted a "total failure" is incorrect. At approximately 2:46 p.m., Grafton did not respond when Deputy Tate entered the holding cell and called her name. Deputy Tate checked Grafton's pulse and breathing and tried an ammonia pack under her nose. Deputy Tate called Nurse Edwards again

and called for an ambulance at approximately 2:50 p.m. Deputy Tate has stated that she looked for something to cover Grafton's mouth in order to perform CPR, but could not find anything. <u>See</u> Record Document 38-6 at 18-22. At approximately 2:52 p.m., six minutes after Deputy Tate originally discovered Grafton unresponsive, the ambulance arrived. During these six minutes, Deputy Tate was "trying to call people … checking for the ambulance, running in and out of the room trying to see is the ambulance here yet." <u>Id</u>. at 22. The evidence qualifies Plaintiffs' claims as a delay of medical treatment, not a "total failure."

The mere delay of medical care can constitute an Eighth Amendment violation but only "if there has been deliberate indifference [that] results in substantial harm." <u>Easter v. Powell</u>, 467 F.3d 459, 463 (5th Cir. 2006), <u>citing</u> <u>Mendoza v. Lynaugh</u>, 989 F.2d 191, 195 (5th Cir.1993). "Section 1983 requires a showing of proximate causation, which is evaluated under the common law standard." <u>Seal v. Harrison Cty., Miss.</u>, 2010 WL 2607205, *8 (S.D. Miss. 2010), <u>citing</u> <u>Murray v. Earle</u>, 405 F.3d 278, 290 (5th Cir. 2005).

The Court acknowledges Deputy Tate's failure to perform CPR on Grafton could raise a jury question of deliberate indifference. <u>Compare</u> <u>McRaven v. Sanders</u>, 577 F.3d 974, 983 (8th Cir. 2009) ("An officer trained in CPR, who fails to perform it on a prisoner manifestly in need of such assistance, is liable under § 1983 for deliberate indifference."); <u>Jones v. City of Cincinnati</u>, 521 F.3d 555, 560 (6th Cir. 2008) (holding that officers were not entitled to qualified immunity on deliberate indifference claim rooted in their failure to provide CPR where they knew the arrestee was handcuffed and not breathing); <u>Tlamka v. Serrell</u>, 244 F.3d 628, 633 (8th Cir. 2001) (holding that corrections officers were not entitled to qualified immunity on deliberate indifference claim where they failed to provide

CPR or to approach prisoner for ten minutes, even though the officers were trained in CPR and the prisoner's condition was obviously life threatening); Sparks v. Susquehanna Cnty., 2009 WL 922489, *10 (M.D. Pa. 2009) (concluding that a jury could find that correctional officer was deliberately indifferent when she was delayed in calling for assistance and was unwilling to perform CPR despite having been trained); Ashworth v. Round Lake Beach Police Dep't, 2005 WL 1785314, *7 (N.D. Ill. 2005) (holding that the failure of officers to perform CPR after calling an ambulance raises jury question of deliberate indifference) with Hyatt v. Callahan Cty., 2015 WL 12964681, *7 (N.D. Tex. 2015), aff'd sub nom. Hyatt v. Thomas, 843 F.3d 172 (5th Cir. 2016) (defendant was not deliberately indifferent for failing to perform CPR for approximately 10 minutes after releasing and lowering decedent who had hung himself); Garza v. City of Donna, 2017 WL 6498392, *14 (S.D. Tex. 2017) (defendant's failure to perform CPR for 30 seconds until medical professionals arrived was not deliberately indifferent); Stogner v. Sturdivant, 2010 WL 4056217, *4 (M.D. La. 2010), citing City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 245 (1983) ("officers are not generally required to administer CPR on an unconscious individual, and instead must only seek emergency aid on the individual's behalf"); Lemire v. California Dep't of Corr. & Rehab., 726 F.3d 1062, 1083-84 (9th Cir. 2013) (defendant's actions during the approximately three minutes between her arrival at the scene and the arrival of RN Hill, which included checking for a pulse, observing decedent's physical appearance, and applying an AED, did not constitute deliberate indifference to decedent's condition).

However, reviewing the entire record and drawing all inferences in favor of Plaintiffs, no reasonable jury could find for Plaintiffs on the causation issue. Plaintiffs have

not submitted any evidence that shows Deputy Tate's failure caused Grafton's death. The evidence shows that it took ambulance personnel approximately six (6) minutes to arrive to the Jail. There is no evidence that CPR during those few minutes could have saved Grafton's life. Plaintiffs have identified several doctors to testify as experts and have produced multiple expert reports. Not a single one of those reports state that CPR could have made any difference. All expert reports identify the cause of death as sepsis, which caused multiple internal organs and body functions to shut down. Grafton's autopsy report lists the cause of death as "Sepsis due to Abdominal Wall Abscess and Cellulitis." Record Document 35-31. The report also listed as a contributory factor "Fracture of Thoracic Spine," which is wholly unrelated to Deputy Tate's role. See id. There is no evidence that a lack of CPR caused or contributed to Grafton's death. There is no evidence that CPR could have revived Grafton. There is no evidence that CPR could have prolonged Grafton's life in any way.

Plaintiffs, in an attempt to prove causation, submitted the affidavit of Nurse Wild which states, "Deputy Tate being certified as competent in CPR knew or should have known that once a patient's heart stopped, it is critical to initiate resuscitative care within 3-4 minutes to avoid brain death."[2] Record Document 38-2 at 9. Regardless of Defendants' objections, Nurse Wild's testimony is not sufficient to prove that the lack of CPR caused Grafton's death.[3] Nurse Wild stops short of speculating that a lack of CPR caused Grafton's death or that, if administered, it would have made any difference in the

---

[2] Defendants object to this opinion for two reasons. First, they contend this opinion was not included in Nurse Wild's affidavit until after the deadline to submit expert reports. See Record Document 39 at 9 n. 1. Second, Defendants argue Nurse Wild is not qualified to render such opinions. See id.

[3] To the extent Plaintiffs assert a "loss of chance" claim against Deputy Tate, the Fifth Circuit has declined to recognize "loss of chance" claims brought under Section 1983. See Phillips ex rel Phillips v. Monroe County, 311 F.3d 369 (5th Cir. 2002).

outcome. After reviewing the entire record and drawing all reasonable inferences in favor of Plaintiffs, the Court finds there is no genuine dispute that Deputy Tate's failure to administer CPR did not cause Grafton's death. Accordingly, Plaintiffs cannot prove Deputy Tate's actions or inactions deprived Grafton of her constitutional rights. Thus, Deputy Tate is entitled to qualified immunity as to this claim.

### D. Section 1983 Claims against Sheriff Bailey

Plaintiffs' complaint does not state whether they are seeking relief under Section 1983 against Sheriff Bailey in his official or individual capacity. <u>See</u> Record Document 1. Thus, the Court must assume that they seek relief against him in both capacities.

To the extent plaintiffs' action against Sheriff Bailey is in his official capacity, plaintiffs fail to state a claim. There is no allegation nor evidence that Sheriff Bailey had a policy, custom or practice of ignoring or failing to treat inmate medical conditions in violation of the Constitution. There is no basis upon which relief can be granted against the Sheriff since § 1983 liability cannot be premised upon respondeat superior. <u>See</u> <u>Monell v. Dept. of Social Services</u>, 436 U.S. 658, 98 S.Ct. 2018 (1978); <u>Thompkins v. Belt</u>, 828 F.2d 298 (5th Cir. 1987). Plaintiffs suing governmental officials in their individual capacities must allege specific conduct giving rise to a constitutional violation. <u>See</u> <u>Oliver v. Scott</u>, 276 F.3d 736, 741 (5th Cir. 2002). This standard requires more than conclusional assertions. <u>Id.</u> Plaintiffs have failed to provide any evidence that Sheriff Bailey was personally involved in any of the factual circumstances giving rise to their complaint. Plaintiffs concede that Sheriff Bailey should be dismissed from the Eighth Amendment claim. <u>See</u> Record Document 38 at 15. Therefore, Plaintiffs' Eighth Amendment claims against Sheriff Bailey are dismissed.

### E. Plaintiffs' State Law Claims

Plaintiffs also brings wrongful death and survival action claims against Defendants under Louisiana state law for negligently causing Grafton's death. <u>See</u> Record Document 1. La. Civ. Code arts. 2315.1 and 2315.2 set forth respectively the survival action and the wrongful death action. <u>See</u> <u>Gibbs v. Magnolia Living Ctr., Inc.</u>, 38,184 (La. App. 2 Cir. 4/7/04), 870 So. 2d 1111, 1113, <u>writ denied</u>, 2004-1148 (La. 7/2/04), 877 So. 2d 146. To successfully bring such a claim, a plaintiff must prove a duty, breach of that duty, cause-in-fact, proximate cause, and actual damages. <u>See</u> <u>Rombach v. Culpepper</u>, 2018 WL 1202556, *6 (E.D. La. 2018), <u>citing</u> <u>Brown v. Lee</u>, 94-104, p.3 (La. App. 5 Cir. 7/13/94); 639 So. 2d 897, 898-99. Under Louisiana law, "the standard of care imposed upon a confining authority in providing for the medical needs of inmates is that the services be reasonable." <u>Wells v. Louisiana Dep't of Pub. Safety & Corr.</u>, 46,428 (La. App. 2 Cir. 8/24/11), 72 So. 3d 910, 926, <u>writ denied</u>, 2011-2637 (La. 2012), 80 So. 3d 474, <u>citing</u> <u>Calloway v. City of New Orleans</u>, 524 So.2d 182 (La. App. 4 Cir. 1988), <u>writ denied</u>, 530 So.2d 84 (La. 1988). In order to establish a negligence claim, Plaintiffs must show that Defendants failed to provide Grafton with reasonable medical care and that Defendants' substandard conduct was the cause of Grafton's untimely death. <u>See</u> <u>Bedingfield ex rel. Bedingfield v. Deen</u>, 487 F.Appx. 219, 229-30 (5th Cir. 2012), <u>citing</u> <u>Mathieu v. Imperial Toy Corp.</u>, 646 So.2d 318, 322 (La. 1994).

"Cause-in-fact is generally a 'but for' inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct is a cause-in-fact." <u>Faucheaux v. Terrebonne Consol. Gov't</u>, 615 So.2d 289, 292 (La. 1993). "To the extent that the defendant's actions had something to do with the injury the plaintiff

sustained, the test of a factual, causal relationship is met." Id. "Stated differently, the inquiry is [d]id the defendant contribute to the plaintiff's harm or is the defendant a cause of the plaintiff's harm?" Roberts v. Benoit, 605 So.2d 1032, 1042 (La. 1991).

"An alternative method for determining cause in fact, which is generally used when multiple causes are present, is the 'substantial factor' test." Roberts, 605 So.2d at 1042, quoting Fowler v. Roberts, 556 So.2d 1, 5 (La. 1989). "Under this test, cause in fact is found to exist when the defendant's conduct was a 'substantial factor' in bringing about plaintiff's harm." Id. "Under either method, it is irrelevant in determining cause in fact whether the defendant's actions were lawful, unlawful, intentional, unintentional, negligent or non-negligent." Id. "Rather, the cause in fact inquiry is a neutral one, free of the entanglements of policy considerations-morality, culpability or responsibility-involved in the duty-risk analysis." Roberts, 605 So.2d at 1042.

Plaintiffs briefly discuss their state law negligence claims in their brief, merely stating "if [Deputy] Tate is shown to be willfully indifferent, she is certainly negligent in the death of [Grafton]." Record Document 38 at 16. However, as discussed extensively above, Plaintiffs have provided no evidence whatsoever that Deputy Tate's actions or inactions were the cause of Grafton's death. In fact, Plaintiffs only reference to causation (besides Nurse Wild's statement addressed above) is a conclusory allegation that "[Deputy Tate's] acts and omissions constitute a cause in fact in [Grafton's] death." Id. However, the autopsy report listed as the cause of death as "Sepsis due to Abdominal Wall Abscess and Cellulitis." Record Document 35-31. Plaintiffs have presented no evidence to show but for Deputy Tate's failure to administer CPR, Grafton would not have died. Plaintiffs have even failed to show how Deputy Tate's failure was a substantial factor

in Grafton's death. Plaintiffs have identified several doctors to testify as experts and have produced multiple expert reports. None have said that CPR could have made any difference. Accordingly, the Court cannot find that Grafton's death was caused by the actions and/or inactions of Deputy Tate.

Plaintiffs also assert Sheriff Bailey is vicariously liable for Deputy Tate's alleged negligence under the theory of respondeat superior. See Record Document 38 at 15-16. Louisiana Civil Code Article 2320 provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." The sheriff, in his official capacity, is the proper party to sue for the torts of his employees. See La. Rev. Stat. § 42.1441.3(E) (defining a sheriff as a distinct political subdivision); Jenkins v. Jefferson Parish Sheriff's Office, 402 So. 2d 669, 669 (La. 1981).

As explained above, however, there is no genuine issue of material fact regarding Plaintiffs' claims against Deputy Tate under Louisiana law. Because Defendants have established Deputy Tate's entitlement to summary judgment as to those claims, Plaintiffs' vicarious liability claim against Sheriff Bailey should be dismissed as well. Therefore, Defendants' motion for summary judgment is granted and Plaintiffs' wrongful death and survival action claims under Louisiana law against both Deputy Tate and Sheriff Bailey are dismissed.

**CONCLUSION**

Based on the foregoing analysis, the Defendants' "Motion for Summary Judgment" (Record Document 35) is **GRANTED**. Plaintiffs are unable to prove the Defendants' conduct violated a constitutional right; therefore, their claims under 42 U.S.C. § 1983 must

be dismissed. Also, Plaintiffs cannot prove that Defendants' action and/or inaction was a cause-in-fact of Grafton's death. For that reason, Plaintiff's Louisiana state law wrongful death and survival action claims must be dismissed.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 22nd day of May, 2018.


S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT